FILED

2020 Aug-28  AM 09:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT FOR THE**
**NORTHERN DISTRICT OF ALABAMA**
**MIDDLE DIVISION**

KAYLYN BRIMER,             )
                                   )
         Claimant,        )
                                   )
v.                           )        CIVIL ACTION NO.
                                   )        4:19-CV-1354-KOB
ANDREW SAUL,           )
ACTING COMMISSIONER OF  )
SOCIAL SECURITY        )
                                   )
         Respondent.     )

## MEMORANDUM OPINION

## I.    INTRODUCTION

Kaylyn Brimer, the claimant, protectively filed an application for supplemental security income on January 14, 2016 and child's insurance benefits for her child on January 21, 2016. (R. 21). She claimed an onset date of November 10, 2010 in both applications. (R. 21). The Commissioner initially denied the claims on March 31, 2016, and the claimant filed a written request for a hearing on April 8, 2016. (R. 21). The Administrative Law Judge held a video hearing on September 12, 2017. (R. 21). On November 20, 2017, the claimant's attorney requested a supplemental hearing on her behalf. (R. 373). The ALJ granted the request and held a second video hearing on April 18, 2018. (R. 40).

The claimant amended her alleged onset date to September 30, 2014 to reflect the date she last worked. (R. 21). In a decision dated August 10, 2018, the ALJ found that the claimant was not disabled as defined by the Social Security Act and was ineligible for social security benefits. (R. 31).

After the ALJ's decision, the claimant appealed to the Appeals Council and submitted additional evidence, including treatment notes from the Regional Medical Center dated April 11, 2018 and October 9, 2018, and a physical capacities evaluation form and medical statement form completed by her cardiologist Dr. Mohammad Kamran. (R. 2). On July 15, 2019, the Appeals Council denied the claimant's request for review. (R. 1-4). In this denial, the Appeals Council stated that it declined to review because the April treatment notes did not show a reasonable probability that they would change the outcome of the decision. (R. 2). Additionally, the Appeals council declined to review the evidence from Dr. Kamran and the October treatment notes because the evidence did not relate to the period at issue. (R. 2).

Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court REVERSES and REMANDS the decision of the Commissioner.

## II.      ISSUE PRESENTED

Whether the ALJ adequately considered the claimant's testimony concerning the side effects of her medication.[1]

## III.      STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if she applied the correct legal standards and substantial evidence supports her factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

---

[1] The claimant also raises three other issues, but because the court will reverse on this issue, the court does not address (1) whether the Appeals Council erred in refusing to review the claimant's new evidence, (2) whether the ALJ supported her decision with substantial evidence had the Appeals Council included the new evidence, and (3) whether the claimant meets the requirements of Listing 4.02 for chronic heart failure.

"No . . . presumption of validity attaches to the [ALJ's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the ALJ's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets a Listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [ALJ]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV.   LEGAL STANDARD

When determining a claimant's credibility, an ALJ must consider the "side effects of any medication the claimant takes or has taken" to treat her symptoms. 20 C.F.R. § 404. 1529(c)(3)(iv). In the Social Security context, "[i]t is conceivable that the side effects of medication could render a claimant disabled or at least contribute to a disability." *Cowart v. Schweiker*, 662 F.2d 731, 737 (11th Cir. 1981). The ALJ may need to investigate the side effects of medication as part of her duty to develop a full record, but the claimant is not relieved of her burden to produce evidence showing that the side effects prevent her from working. *See Walker v. Comm'r of Soc. Sec.*, 404 F. App'x 362, 366 (11th Cir. 2010) (finding the ALJ did not err when he found the claimant was not disabled after considering her side effects and finding nothing in her medical records or testimony to suggest they were severe enough to be disabling) (citing *Cowart v. Schweiker*, 662 F.2d 731, 737 (11th Cir. 1981)).

## V.   FACTS

*Mental and Physical Impairments*

The claimant was twenty-three years old at the time of the ALJ's decision. (R. 31). She graduated from high school and has past experience as a CNA, human resources clerk, and documents preparer. (R. 96, 121-22). The claimant alleges disability as of September 30, 2014, because of dilated cardiomyopathy, depression, anxiety, and lymphoblastic lymphoma in remission. (R. 327).

The claimant developed lymphoma at the age of two. The chemotherapy used to treat her lymphoma later caused the claimant's cardiomyopathy, which is a disease of the heart that makes

the heart muscle work harder to pump blood to the rest of the body and can cause heart failure.[2] (R. 173).

On August 4, 2014, the claimant saw Dr. Mohammad Kamran for the first time at Cardiology & CV Surgery because she had shortness of breath and chest pain. She also complained of weight gain, swelling of hands and feet, difficulty breathing when lying down, racing or skipping heartbeats, sleep disturbances because of breathing, joint pain, and neurological tingling or weakness. The claimant stated that she drinks tea or soft drinks five to six times a day and will occasionally swim or walk for exercise. Dr. Kamran examined the claimant and found that she had an S4 gallop, which is an extra heart sound caused by diminished expansion of the left ventricle; normal gait; full range of motion in all joints; and normal reflexes, coordination, muscle strength and tone. The claimant told Dr. Kamran that her ejection fraction was previously thirty-eight percent, but it was thirty-two percent at this visit. He prescribed Aldactone and Furosemide for swelling and Carvedilol for heart failure. (R. 457-61).

The claimant saw Dr. Kamran again on August 18, 2014 for an exercise stress test because she had shortness of breath. The claimant stopped exercising because she had chest discomfort. She reached a maximum workload of 6.3 METs. Overall, Dr. Kamran said her stress test was normal, showing no evidence of an inadequate blood supply to the claimant's heart. The claimant had an ejection fraction of forty percent. (R. 454).

On a January 8, 2015 follow up visit with Dr. Kamran, the claimant complained of swelling in her legs, tightness in her chest, and shortness of breath. The claimant repeated the same complaints she had stated at her first appointment. Dr. Kamran examined the claimant and found she had an S4 gallop. He noted that the claimant's chest discomfort had improved, her

---

[2] *See* https://www.mayoclinic.org/diseases-conditions/cardiomyopathy/symptoms-causes/syc-20370709.

cardiomyopathy was unchanged, and her shortness of breath had worsened. To treat her shortness of breath, Dr. Kamran doubled the claimant's Lasix prescription. He also prescribed aspirin and Amitriptyline, an antidepressant. He recommended exercise and a low fat, low cholesterol diet. (R. 448-52).

The claimant saw Dr. Kamran again on January 20, 2015 for a multigated acquisition (MUGA) scan. Dr. Kamran noted that the claimant had an ejection fraction of thirty-nine percent, indicating reduced function of the heart. The claimant saw Dr. Kamran again two days later for a follow up. She denied shortness of breath and chest pain at rest, with exertion, and at night. She had an S4 gallop. Dr. Kamran prescribed Digoxin for the claimant's cardiomyopathy. He recommended that the claimant return for a yearly follow up, and again recommended exercise and a low fat, low cholesterol diet. (R. 443, 438-42).

On April 15, 2015, the claimant saw Dr. Kamran because she had been having heart palpitations, shortness of breath, and fatigue. She denied having chest pain. Dr. Kamran equipped the claimant with a Holter monitor and asked her to wear it for a full day so he could monitor her heart. Dr. Kamran examined her and found she had a S4 gallop and no swelling in her extremities. He noted that her cardiomyopathy was unchanged, instructed her to continue with her current medications, and recommended exercise and a low fat, low cholesterol diet. (R. 424-28).

At a follow up on April 22, 2015, Dr. Kamran found that the claimant's Holter monitor revealed normal heart activity. He advised the claimant that she may want to consider a Reveal implant device, which monitors a patient's heart rate and rhythm, but she refused. The claimant denied chest pain and shortness of breath. Upon examination, Dr. Kamran noted that the claimant had a S4 gallop. He also noted that the claimant continued to have occasional

palpitations, her cardiomyopathy was unchanged, and her shortness of breath had improved. He again recommended exercise and a low fat, low cholesterol diet. (R. 419-23).

The claimant next saw Dr. Kamran on July 29, 2015 for a follow-up visit, at which she complained of palpitations, swelling in her hands and feet, dizziness when she stands up too fast or stands for long periods of time, and sharp, stabbing chest pain. The claimant had a S4 gallop and continued to have palpitations. The claimant's recent Holter monitor results did not show any abnormalities. Dr. Kamran again offered the claimant a Reveal implant, and she declined. He stated that her chest discomfort had improved and her cardiomyopathy was unchanged. Concerning the claimant's dizziness, Dr. Kamran noted that the claimant had slight tachycardia, a condition in which a patient's heart beats faster than 100 beats per minute. He decreased her prescription of Aldactone, which has a potential side effect of dizziness. He also instructed the claimant to continue her current medication regime, exercise, and maintain a low fat, low cholesterol diet. (R. 414-18).

Dr. Kamran then saw the claimant on August 31, 2015 for another follow up. She denied chest pain, shortness of breath, and swelling in her extremities. Dr. Kamran noted that the claimant had an S4 gallop, her palpitations and chest discomfort had improved, and her fatigue and cardiomyopathy were unchanged. He also stated that she was doing okay off of Aldactone and decreased her Carvedilol prescription by half. She again refused a Reveal device implant. Dr. Kamran encouraged her to exercise and keep a low fat, low cholesterol diet. (R. 409-413).

At an October 27, 2015 follow-up visit with Dr. Kamran, the claimant denied chest pain, dizziness, and shortness of breath. She had recently found out she was pregnant and still in her first trimester. He noted that she had a S4 gallop and that her most recent ejection fraction was

forty-eight percent. Dr. Kamran found that the claimant's fatigue, shortness of breath, and cardiomyopathy were unchanged. (R. 404-08).

At the request of the Social Security Administration, Dr. Robert G. Summerlin, a licensed psychologist, conducted a consultative evaluation of the claimant on March 30, 2016, at the Anniston Psychology and Counseling Center. Dr. Summerlin noted that the claimant was "polite, responsive, and appeared to be providing a good effort" during the examination; was oriented with respect to person, place, time and circumstances; had attention, concentration, and memory functioning well within the normal limits; appeared logical, coherent, and focused; had social judgment, a general fund of information, computational skills, and a vocabulary which reflected that of a person of average intelligence; had a broad and appropriate affect; and was responsive to questioning. When asked to describe her mood, she smiled and said "pretty good."

The claimant explained that she was diagnosed with lymphoblastic lymphoma when she was two years old and had been in remission for the past seventeen years. When engaged in physical activity like climbing stairs, she stated that she experiences shortness of breath because of her cardiomyopathy. The claimant told Dr. Summerlin that she had never been treated by a mental health professional. She said her gynecologist prescribed Zoloft for her anxiety and depression, which she took for one year and stopped taking a year ago. She told him that she lives alone, completed the requirements to work as a CNA, and worked as a CNA for a couple months but had to stop because of her medical issues.

She told Dr. Summerlin that she periodically wakes up in the night because of shortness of breath and estimated that she slept seven hours each night. She also reported that she can independently bathe, dress, and care for her personal hygiene; participates in tasks like simple cooking, laundry, and periodic yard work; and drives a vehicle, shops, visits with family and

friends, and operates a computer. Dr. Summerlin concluded that the claimant had no psychological disorder that would prevent her from participating in meaningful work activity and stated that her disability should be viewed from a physical instead of emotional perspective. (R. 479-81).

Also on March 30, 2016, State agency medical consultant Dr. John Maloof reviewed the claimant's record and determined that the claimant was capable of performing work-related activities. (R. 154-75)

The claimant temporarily switched her treatment to Dr. Salpy V. Pamboukian. On August 17, 2016, she saw Dr. Pamboukian and Dr. Ashrah El-Dabh at The Kirkland Clinic of UAB Hospital for a cardiology visit. For her medical history, the claimant stated that she had an ejection fraction of nineteen percent and was diagnosed with cardiomyopathy when she was sixteen. She said her ejection fraction had improved to fifty percent since her diagnosis. The claimant uneventfully delivered her baby a few months earlier on May 12, 2016. She stated that her last echocardiogram showed her ejection fraction had dropped, but she did not remember the exact number.

The claimant complained of significant functional limitations, and Drs. Pamboukian and El-Dabh encouraged the claimant to have another echocardiogram. Upon examination, Dr. Pamboukian found that the claimant did not have a heart gallop. Dr. Pamboukian noted that the claimant's Holter monitor showed extra heartbeats that begin in one of the heart's two lower ventricles, and the claimant complained that she was still having heart palpitations. Drs. Pamboukian and El-Dabh decreased the claimant's Lasix prescription because she seemed "slightly dry," and a potential side effect of the medication is dehydration. They also started her on a low dose of Lisinopril for her cardiomyopathy and said she might benefit from taking

potassium and magnesium supplements for her heart function. The claimant had an echocardiography at The Kirklin Clinic on March 22, 2017, ordered by Dr. Pamboukian. Her ejection fraction was fifty to fifty-five percent and her left ventricle was borderline dilated. (R. 967-70, 93).

The claimant had an appointment with Dr. Michael Sesay at his family medicine office to establish care on March 23, 2017. She reported that she was generally healthy, had no change in strength or exercise tolerance, palpitations, chest pain, muscle or joint pain, limitations of her range of motion, or depressive symptoms. Upon examination, Dr. Sesay noted that the claimant had "good affect," no heart gallops, and no swelling in her extremities. He instructed the claimant to return for a follow-up appointment in three months. (R. 1284).

After switching her care to Dr. Pemboukian for a year, the claimant returned to Dr. Kamran again for a follow up on August 9, 2017. He noted that she had an event monitor and a Holter monitor, and both were negative. The claimant complained of dizziness, lightheadedness, and lots of palpitations, but denied any increase of shortness of breath. Dr. Kamran also noted that she worries she "may just perish." He examined the claimant and found that she had no heart gallops and no swelling in her extremities. He discontinued her Aldactone prescription and started her on Coreg and a low dose of beta blockers. Her shortness of breath had improved over the past year, her depression was "much better," and she continued to have palpitations. Dr. Kamran stated that the cause of her palpitations was unknown. He recommended an implantable Reveal monitor to collect the heart rhythm data, and she agreed to the procedure. He advised her to exercise 150 minutes a week. (R. 611-15).

On August 22, 2017, the claimant underwent a procedure at Cardiology and CV Surgery for the implantation of a Reveal monitor. The claimant had an echocardiogram that revealed an

ejection fraction of thirty to thirty five percent and dilation of her left ventricle, showing deteriorated function. However, Dr. Kamran listed her ejection fraction as twenty percent in his notes. Upon examining the claimant, Dr. Kamran noted swelling in her extremities and stated that her cardiomyopathy had worsened since her pregnancy. At a follow-up on September 6, 2017, Dr. Kamran noted that the claimant's shortness of breath and cardiomyopathy were unchanged and her Reveal monitor had not recorded anything of concern. (R. 687-97).

After going to the emergency room on September 21, 2017 because of shortness of breath and palpitations, the claimant saw Dr. Kamran the same day. She said she was having palpitations because she was very anxious. He noted that she still had dizziness, although he was unsure of the cause and advised her to continue taking her current medications. He also stated that her shortness of breath had improved and her Reveal monitor did not indicate that her heart was beating too fast. She returned for a follow-up visit with Dr. Kamran on September 25, 2017. He noted that her ejection fraction, fatigue, and dizziness had improved. The claimant stated that she still had dizziness and some palpitations, and Dr. Kamran recommended that she take fewer medications. He took the claimant off Aldactone and Digoxin, decreased her Coreg prescription, and told her to take Lasix twice a week. (R. 1054-57, 1059-63).

The claimant had a follow-up visit with Dr. Sesay on October 6, 2017. She denied chest pain and complained of anxiety, which she stated she had "had her whole life," but her symptoms had worsened because of stress caused by her family life and worries over her and her family's health. The claimant said she experienced anxiety daily, but the severity of it varied. Dr. Sesay examined her, finding that her "affect is good," and she had no heart gallops or swelling in her extremities.

11

She saw Dr. Kamran on October 16, 2017 for another follow-up visit. She said she was "feeling better." Dr. Kamran noted that her ejection fraction had improved and was "much better" at forty percent, and her dizziness, fatigue, shortness of breath, and cardiomyopathy had improved. He prescribed her Buspirone and Digoxin. (R. 1282, 1064-68).

At the request of the Social Security Administration, cardiologist Dr. Harold P. Settle saw the claimant on October 19, 2017 for a disability evaluation. The claimant told Dr. Settle that in July of 2012, she had an ejection fraction of sixty percent, and since then she has "done relatively well with no major changes." She stated that she has difficulty breathing; gets short of breath if she walks more than one block; has daily palpitations; has "racing episodes" about twice a month, lasting twenty minutes; most recently had an ejection fraction of thirty-two percent; and "apparently has had episodes of her heart racing up to 150 beats per minute" as shown on her Reveal monitor.

Dr. Settle's physical examination of the claimant showed no evidence of chronic heart failure or heart gallop, and the claimant appeared healthy. He noted that she had no difficulties during her previous pregnancy and delivered a healthy baby girl. He concluded that the claimant was in Class II of the New York Heart Association functional classifications, meaning her heart condition caused slight limitation during ordinary activity. (R. 877).

Although the ALJ hearing occurred on September 12, 2017, the claimant had a supplemental hearing on April 18, 2018. The following information was available for that hearing.

On October 24, 2017, Dr. Settle completed a Medical Source Statement of Ability concerning the claimant's capacity for physical activity. Dr. Settle stated that the claimant could frequently lift or carry ten pounds, occasionally lift or carry eleven to twenty pounds, and never

lift or carry more; could sit for six hours, stand for two, and walk for one without interruption; could sit for seven hours, stand for three, and walk for two in an eight-hour work day; did not need a cane to walk; could occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl; could never climb ladders or scaffolds; and was capable of shopping, cooking, feeding herself, and caring for her personal hygiene; could sort, handle, and use files; could travel unassisted; could walk one block at a reasonable pace on rough or uneven terrain; and could climb a few steps at a reasonable pace with the use of a hand rail. (R. 880-84).

Dr. Kamran next saw the claimant on January 4, 2018. He stopped her Coreg prescription and prescribed Sotalol, which is used to treat rapid heart rates. He performed an echocardiogram of the claimant, revealing an ejection fraction of thirty to thirty-five percent. He also noted that the claimant's fatigue and depression were unchanged.

On January 5, 2018, at a follow-up visit with Dr. Sesay, the claimant denied chest pain, but complained of anxiety and shortness of breath with exertion. Dr. Sesay examined the claimant and found no swelling in her extremities, a regular heart rate, and no heart murmurs, rubs, or gallops. He instructed the claimant to return in three months for another follow-up visit. (R. 1069-73, 1075, 1278).

The claimant saw Dr. Kamran for a follow-up visit on January 10, 2018, and said she was "still having palpitations from the other day, but they were less." He noted that the claimant's dizziness had improved, and her fatigue and cardiomyopathy were unchanged. Because of her ongoing anxiety and cardiomyopathy, he stated that the claimant must be observant of her heartrate. Dr. Kamran advised her to get a defibrillator, which she declined. He doubled her dose of Sotalol and suggested that she come back for an EKG in two weeks. (R. 1078-82).

13

On January 29, 2018, the claimant saw Dr. Michael Sesay for a sore throat, and denied chest pain and shortness of breath. Upon examination, Dr. Sesay noted that she had no heart gallops.

At her next follow-up with Dr. Kamran on January 31, 2018, the claimant had swelling in her feet. Dr. Kamran instructed her to elevate her legs when resting and noted that her shortness of breath and palpitations were unchanged. (R. 1276, 1084-87).

The claimant saw Dr. Sesay on February 19, 2018 for a follow-up appointment and medication refills. She denied chest pain and shortness of breath, and Dr. Sesay noted that the claimant did not have a heart gallop. On a March 14, 2018 follow-up visit with Dr. Kamran, the claimant complained that her heart sometimes gets out of rhythm when she is resting. Dr. Kamran noted that her swelling had improved and her palpitations were unchanged, although her event monitor did not pick up any palpitations. Additionally, Dr. Kamran noted that the claimant had shortness of breath when exerting herself. (R. 1274, 1266-69).

The claimant returned to Dr. Sesay on April 6, 2018. She denied chest pain, but complained that she had lately experienced shortness of breath when exercising. Upon examination, Dr. Sesay noted that the claimant had a regular heart rate, no heart murmurs, gallops, or rubs, and no swelling in her extremities. (R. 1271-72).

*The ALJ Hearing*

The first ALJ hearing took place on September 12, 2017 via video conference. At the hearing, the claimant, family friend Jean Edney, and Vocational Expert Marsha H. Shulman testified. The claimant was twenty-two years old. She testified that she lives in a mobile home with her mother and seventeen-month-old daughter. She said she has a driver's license and

sometimes drives her mother's car, but a family friend drove her to the hearing. She also testified that she graduated high school and made "pretty good grades." (R. 88, 93-96).

The claimant estimated that the longest she worked in one job was a little more than three months. She said she has tried to work three jobs, including work as a CNA, a position in human resources at Honda, and temporary work scanning speeding tickets at a courthouse. With each job, the claimant said her heart problem prevented her from continuing to work and the same symptoms impeded her each time, causing her to have to sit down or leave early. (R. 106, 117-20).

She said that her cardiologist told her that it would be best for her not to work because it put too much stress on her heart. When asked if she thought she could do any work, the claimant stated that she did not, and she does not seem to have the physical capacity to "do much of anything." (R. 98-99).

The claimant stated that she last worked as a CNA at National Health Corporation, a nursing home, and received on-the-job training and passed a certification test for the work. While working as a CNA, the claimant stated that her employer made accommodations for her condition by giving her "light duty," and another CNA would help her when she could not continue working. She said she sat for six hours of a work day and worked on patients' charts. She testified that she lifted no more than ten pounds and did not lift patients. When asked how she was able to start the position doing light work, the claimant said her great-grandmother had been in the nursing home, so she knew people that worked there, and they knew of and were accommodating to her condition. She said she tried working as a CNA twice and returned to the same nursing home the second time. However, the claimant testified that CNAs are "constantly

on the go," and despite the assistance she received, she had to quit because her shortness of breath, fatigue, and heart palpitations prevented her from doing the work. (R. 97, 99, 115-16).

When in human resources at Honda, the claimant testified that she worked on a computer filling out forms for employee's leave time, but she would have to walk across the plant to get to a second office. The claimant said it was a thirty-minute walk between offices, and she would sometimes have to make it multiple times a day. She said she quit the job after less than two months because she could not walk that far and could not handle the stress of the job. (R. 98, 118-20).

The claimant also stated that she worked in a temporary position scanning speeding tickets at the Talladega Judicial Building. She testified that the job required her to pick up boxes full of speeding tickets, and she was unable to lift them. She also testified that she sat most of the time and told her employer she would have to leave the job if she could not sit. The claimant estimated that she worked the job for three months, and said she did finish the temporary period for which she was hired, but missed a lot of days because of her heart condition. (R. 120-21).

The claimant stated that her ejection fraction was 32 percent at the time of the hearing and had been at that level for a couple of months. She said that at her worst, her ejection fraction was nineteen percent, and her heart "was enlarged with fluid behind it." She said her ejection fraction had improved because of her medications and monthly follow-ups with her cardiologist. For treatment options, the claimant stated that she could get a pacemaker, and if that did not help, her next and final option would be a heart transplant, but she would need to have an ejection fraction below twenty percent to be eligible for the transplant. (R. 99-101).

At the time of the hearing, the claimant said she was taking Coreg, Lasix, Aldactone, Aspirin, and Lexapro. Except for aspirin, she said all of her medications cause her to be tired

with "just no energy." She said the fatigue will "kick in" about thirty or thirty-five minutes after she takes her medications in the morning and last for the rest of the day, so that she is "usually pretty tired." The claimant also said that she has to use the bathroom "about every five minutes" as a side effect of taking Lasix. (R. 101-02).

The claimant said she has good days and bad days. On some bad days, her heart races before she gets out of bed, she cannot breathe, and she must lie in bed and try to calm down. The claimant said that, when her heart races, she feels like her heart is "going to jump out of [her] chest," she has "just ran a marathon," and she is "fixing to die." In a thirty-day period, she estimated that she had ten or more bad days, and is never totally symptom free, although sometimes she has fewer symptoms. (R. 104).

Regarding sleep, the claimant said she must have three pillows, and she wakes up unable to breathe. She said she feels like she is being smothered, so she will sit up and take deep breaths until she is calm enough to try to sleep again. For bathing, the claimant said she takes baths instead of showers because it is easier to sit. When dressing herself, she said she must take her time because dressing tires her. Additionally, the claimant stated that her mother grocery shops, cooks for her, and helps care for her child. (R. 102-05).

The claimant estimated that she could stand or do a chore for five to ten minutes before needing about a five-minute rest. She said standing is sometimes a problem, and she needs to sit down or take a break because standing tires her. She also stated that stairs have been a problem for her since she was seventeen, and she has a ramp at her back door so she can avoid them. When she was in school, the claimant said she had to get a doctor's note so she could use the elevator instead of the stairs. (R. 103-06).

The claimant also testified that she is never left alone. She stated that her cardiologist does not want her to be alone and she likes having someone with her. The claimant's attorney acknowledged that no record exists of the claimant's cardiologist saying that he did not want her to be alone. The claimant said she should not be left alone because she needs immediate medical attention if her heart stops, and if alone, she is "just there dead." She also stated that she feels like she may not wake up in the morning when she goes to sleep. (R. 102-03).

The claimant also testified regarding her mental impairments. When asked about her treatment for depression, the claimant said having her condition at her young age made her "just not want to be around anybody" but her daughter. She said she is still taking medication for her depression. Regarding her anxiety treatment, the claimant stated that leaving home makes her anxious, and in general, her anxiety builds on her other symptoms of a racing heart, palpitations, and shortness of breath. (R. 106-07).

Other than the psychological evaluation ordered by the Social Security Administration, the claimant stated that she has never sought or had mental health treatment or therapy for anxiety or depression. She testified that she takes Lexapro for depression, prescribed by her gynecologist. (R. 113).

Jean Edney, a neighbor and family friend to the claimant, testified that she had known the claimant since the claimant was five years old. When the claimant was a child, Ms. Edney said she remembered the claimant's doctor wrote her a note so she could be exempt from P.E. and told the claimant that she could not use stairs. Ms. Edney stated that she sees the claimant two to four times a day to check on her because of her heart condition, and the claimant calls her because she "feels like she's going to die," so she will visit the claimant to try to calm her down. She testified that she will take the claimant's blood pressure and pulse. She said the claimant's

mother nurtures the claimant by doing tasks for her, whereas Ms. Edney tries to "take care" of the claimant. (R. 108-09, 111).

Additionally, Ms. Edney testified that she helps the claimant by cooking, cleaning, doing laundry, and "picking up" for the claimant. When asked why the claimant needs her help, Ms. Edney stated that the claimant "can't hardly do much" because her congestive heart failure has made her heart very weak. Concerning the claimant's symptoms, Ms. Edney said she has shortness of breath, chest pain, and fatigue. For example, Ms. Edney testified that she has noticed the claimant's heart starts beating faster and her chest hurts when she does tasks that involve moving her arms, like washing dishes. In such instances, Ms. Edney stated that she will tell the claimant to sit down. (R. 110).

Regarding anxiety and depression, Ms. Edney testified that the claimant cries, worries about being there for her daughter, does not know "if  today's going to be her last day," and gets upset when she thinks she is dying. She said she has seen "everything" to indicate that the claimant struggles with anxiety and depression, the claimant "can't handle it," and it is "just an every day thing with her and her heart." (R. 111).

Ms. Edney described the claimant's episodes of feeling like she will die as "spells," and said she has them at least twice a day. During a spell, Ms. Edney said the claimant will have trouble remembering things. She said the length of a spell "just depends"; sometimes she will try to calm the claimant for a couple hours, and other times when she cannot talk the claimant out of the spell, she will take her to the emergency room. (R. 112).

Finally, vocational expert Marsha H. Shulman testified about available jobs that the claimant could perform. First, Ms. Shulman categorized the claimant's past work as a nurse aid, classified as medium, semi-skilled work, but the claimant performed it in a light capacity; a

human resources clerk, classified as sedentary, semi-skilled work; and a document preparer, classified as sedentary, unskilled work. (R. 121-22).

Next, the ALJ asked Mrs. Shulman to assume a hypothetical individual with the claimant's age and education who could perform sedentary work with the following limitations: can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance and stoop; occasionally kneel and crouch; never crawl; never work in unprotected heights or around moving mechanical parts; occasionally operate a motor vehicle; frequently respond to supervisors and coworkers; occasionally respond in an appropriate manner to the public; and has time off task that can be accommodated by normal breaks. In addition, the hypothetical individual is limited to performing simple, routine, and repetitive tasks, but not at a production rate pace. Mrs. Shulman responded that the hypothetical individual could perform the claimant's past work as a document preparer. She said the individual could also work as a cuff collar folder, with 32,000 jobs available nationally; a surveillance system monitor, with 30,000 jobs available nationally; and an electronics worker, with 32,000 jobs available nationally. Mrs. Shulman stated that all of these jobs were classified as unskilled. (R. 122-23).

As a second hypothetical, the ALJ added the limitation that the individual would be off-task fifteen to twenty percent of the work day in addition to normal breaks. Mrs. Shulman stated that, if the off task time were a consistent pattern, the individual would not be able to do the aforementioned jobs. The claimant's attorney then asked Mrs. Shulman if jobs existed that the claimant could do if she had to rest for five minutes after five minutes of work consistently throughout the work day. Mrs. Shulman said no jobs existed that the claimant could perform if the rest meant total abandonment of work. (R. 123-24).

*Supplemental Hearing*

After the first hearing, the ALJ ordered a consultative examination of the claimant by Dr. Settle.  The supplemental hearing took place on April 18, 2018 via video conference. At the hearing, the claimant and vocational expert Renee Smith testified.

The claimant testified that her hands and feet swell, and she treats the swelling by sitting and propping up her feet for one or two hours. She also stated that she can do a task for about ten minutes before she must sit down to catch her breath and steady her heartrate. (R. 42, 46-47).

The claimant testified that she started new medications the day before the hearing to treat her abnormal heart rhythm, including Amiodarone for heart rhythm, Lisinopril for heart failure, and Aldactone for swelling caused by fluid retention. When asked about side effects, she said she felt "really tired" thirty minutes after taking Amiodarone at about nine o'clock that morning, and still felt fatigued at the hearing, which began at about one o'clock in the afternoon. Additionally, the claimant testified that Aldactone caused her to frequently urinate, such that she would need to use the restroom five to ten times between the time she woke up and five o'clock in the afternoon. (R. 40, 43-45).

The claimant testified that her ejection fractional fluctuates with a bottom threshold of thirty percent and that her cardiologist prescribed different medications to normalize her ejection fraction. She stated that her cardiologist was hoping to treat her cardiomyopathy with medication, but she may need to get a defibrillator if the medications do not help. (R. 49-50).

Since her alleged onset date, the claimant said she has had about five bad days per month on which she felt so tired that she did not want to get out of bed. More recently, the claimant said she had days where she would stay in bed because of her racing heart and need to use the restroom whenever she got up. The claimant said that six stairs are problematic for her. Her

mother helps her care for her child "full time," and grandmother "helps out a lot as well." (R. 50-52).

Concerning the consultative evaluation, the claimant stated that she spent less than thirty minutes with Dr. Settle, and he checked her blood pressure, listened to her heart, and asked questions. She told him she could probably stand for ten to fifteen minutes, lift no more than ten pounds, and walk less than a mile before needing a break. She said the doctor did not ask about the swelling she experienced in her hands and feet. (R. 45).

Vocational expert Renee Smith testified about available work in the national economy that she could perform. The ALJ presented Ms. Smith with a hypothetical in which an individual of the claimant's age, education, and past relevant work experience had to "sit with legs propped at waist level or above for one to two hours in an eight-hour work day." Ms. Smith testified that no jobs exist that the hypothetical individual could perform. Ms. Smith also noted that generally employers tolerate no more than two absent days per month in unskilled employment. (R. 52-53).

As a second hypothetical, the ALJ described a hypothetical individual of the claimant's age, education, and past work experience who could sit for less than thirty minutes, stand for less than fifteen minutes, and lift less than ten pounds. Ms. Smith said that the hypothetical individual could not perform a full range of light work. Finally, the ALJ presented a third hypothetical, in which an individual of the claimant's age, education, and past work experience could only perform a task for five to ten minutes before having to rest for ten minutes. Ms. Smith said no jobs are available that the individual could perform.[3] (R. 53-54).

---

[3] At the supplemental hearing, the vocational expert did not list any jobs available in large numbers in the national economy that the claimant could perform.

*ALJ's Decision*

On August 10, 2018, the ALJ issued a decision finding the claimant "not disabled." First, the ALJ found that the claimant had not attained the age of twenty-two by the alleged onset date, September 30, 2014, nor had she engaged in substantial gainful activity since the onset date. Although the claimant had worked after the onset date as a CNA, the ALJ stated that her earnings were "below established substantial gainful activity thresholds for [the] referenced period." The ALJ also found that the claimant has one severe impairment—cardiomyopathy. (R. 24, 31).

Next, the ALJ found that the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Appendix 1. In particular, the ALJ noted that she considered Listings 4.02, 4.04, and 4.05, but did not find that the evidence met the severity of the criteria of any of the Listings. The ALJ said she "considered all symptoms and the extent to which [they could] reasonably be accepted as consistent with the objective medical evidence and other evidence." With those considerations in mind, the ALJ stated that any impairments in the medical record that she did not reference in her decision were "slight abnormalit[ies]" that would minimally affect the claimant and would not be expected to impede her ability to work, making them nonsevere. (R. 24, 26).

The ALJ also determined that the claimant's mental impairments, anxiety and depression, were nonsevere because they did not cause more than "minimal limitation in the claimant's ability to perform basic mental work activities." In making this determination, the ALJ said she considered the impairments singly and in combination with any other impairment, but the impairments did not meet or equal a Listing. Specifically, she stated that the "Paragraph B"

criteria were not satisfied. The ALJ determined that the claimant had no limitations in her ability to understand, remember, and apply information or her ability to adapt and manage herself, and only mild limitations in social functioning and concentration, persistence, or pace.

To support this finding, the ALJ noted that the claimant worked some as a CNA after her alleged onset date, attends to her personal care, cares for her daughter, and does household chores. The ALJ also stated that the claimant was "pleasant and forthcoming" at both hearings, and no evidence in the record showed that she lacked the ability to "regulate her emotions, control her behavior, or maintain her wellbeing in a work setting." To support her finding on the claimant's social functioning, the ALJ noted that the claimant lives with her mother and child, with whom she has healthy, respectable relationships. Finally, the ALJ noted that the claimant is capable of focusing and completing tasks in a timely manner because she has worked some as a CAN after her alleged onset date. (R. 24-25).

The ALJ also gave partial weight to Dr. Robert G. Summerlin's opinion where he stated that the claimant does not have a mental disorder that would prevent her from working. The ALJ noted that Dr. Summerlin stated the claimant had a "broad and appropriate" affect and said she was feeling "pretty good." Further, the ALJ took note of Dr. Summerlin's statements that the claimant's attention, concentration, and memory functioning were well within normal limits; that her abstract thinking ability, fund of general information, computational skills, vocabulary, and social judge reflected those of a high school graduate and a person of average intelligence; that she had logical, coherent, and focused thought processes; and that she was responsive to questioning. (R. 25).

Additionally, the ALJ noted that the claimant's gynecologist prescribed Lexapro, but the claimant has never received or been told to seek mental health treatment. The ALJ stated that,

giving the claimant the greatest benefit of the doubt, the record supports some mental limitations, but her symptoms are not as disabling as the claimant has alleged. After finding the claimant's mental impairments nonsevere, the ALJ noted that she would consider the degree of the claimant's mental limitations when determining her RFC  (R. 25).

The ALJ gave little weight to Ms. Edney's testimony at the hearing because it was "a lay opinion[s] based upon casual observation, rather than objective medical examination and testing." (R. 27).

Next, the ALJ found that the claimant had the RFC to perform sedentary work with the following clarifications and exceptions: cannot climb ladders, ropes, or scaffolds; cannot crawl, can frequently balance; can occasionally climb ramps and stairs; can occasionally kneel and crouch; cannot be exposed to unprotected heights and hazardous moving parts; can occasionally operate a motor vehicle; can perform simple, routine, repetitive tasks at no production rate pace; can frequently respond to supervisors, coworkers, and the public; and can have time off task accommodated by normal breaks. (R. 26).

In making this finding, the ALJ stated she considered all symptoms and the extent that the symptoms could reasonably be accepted as consistent with the objective medical evidence, other evidence, and opinion evidence. Ultimately, the ALJ determined that the claimant's statements about the intensity, persistence, and limiting effects of her symptoms were inconsistent with the medical evidence and other evidence in the record. (R. 27-28.)

To support this finding, the ALJ noted that the claimant has a history of specialized treatment with her cardiologist, Dr. Mohammad Kamran, and his treatment notes show good compliance, control with medication, and good symptom management. The ALJ also found that throughout the record, doctors encouraged the claimant to exercise and follow a low fat and low

cholesterol diet and noted that she had essentially normal cardiovascular examinations aside

from a S4 gallop. Additionally, the ALJ noted that, at the claimant's first appointment with Dr.

Kamran on August 4, 2014, she had an essentially normal cardiovascular exam other than a S4

gallop and an ejection fraction of thirty-two percent. She had a stress test two weeks later that

was essentially normal, and her ejection fraction was forty percent. The ALJ noted that the

claimant's ejection fraction was thirty-nine percent on January 20, 2015, and the claimant was

prescribed Digoxin two days later. The claimant was then given a Holter monitor, and the ALJ

noted that the claimant's shortness of breath improved, she had only occasional palpitations, and

her Holter monitor results were normal. (R. 28).

Regarding the claimant's cardiomyopathy, the ALJ followed her ejection fraction. The

ALJ noted a decline in the claimant's cardiomyopathy symptoms after the claimant became

pregnant, including a dilated left ventricle, swelling, and an ejection fraction of twenty-five

percent and thirty to thirty-five percent. However, the ALJ stated that on March 22, 2017, the

claimant's ejection fraction was fifty to fifty-five percent. The ALJ also noted that a Reveal

device did not indicate any arrythmia, the claimant's ejection fraction rose back up to forty

percent, she reported "feeling much better," and her shortness of breath and fatigue improved.

(R. 28).

The ALJ stated that the claimant declined surgery for an implantable cardioverter-

defibrillator. Next, the ALJ noted that in January 2018, the claimant had an ejection fraction of

thirty to thirty-five percent and had trace swelling in her hands and feet. (R. 28). Finally, the ALJ

considered the claimant's most recent follow-up visit on April 6, 2018, at which she denied any

chest pain or shortness of breath, and Dr. Sesay examined her heart and found no irregularities

with her heart rate or rhythm. (R. 29).

The ALJ gave great weight to Dr. Harold P. Settle's opinion that the claimant's cardiac disease only slightly limited her activity and she is capable of sedentary work. The ALJ noted that Dr. Settle supported his opinion with objective testing. (R. 29).

The ALJ gave partial weight to the opinions of the State agency medical consultant Dr. Maloof who reviewed the evidence and determined that the claimant could perform work-related duties. The ALJ found that the record, including that which was presented at the hearing level, supports a more limited RFC for sedentary work. Further, the ALJ noted that none of the claimant's treating physicians placed greater restrictions on her than the restrictions listed by the ALJ. (R. 29).

Finally, the ALJ found that the claimant was capable of performing her past relevant work as a document preparer. In making this determination, the ALJ relied on the testimony of the vocational expert at the first ALJ hearing, and found that the job did not require work activities precluded by the ALJ's identified restrictions. Based on the vocational expert's testimony and using the grids as a framework, the ALJ concluded that the claimant was capable of making a successful adjustment to unskilled, sedentary work that exists in significant numbers in the national economy, such as work as a cuff/collar folder, a surveillance system monitor, and an electronics worker. Thus, the ALJ concluded that the claimant was not disabled as defined under the Social Security Act. The ALJ also recommended that the claimant seek assistance from the State of Alabama's Vocational Rehabilitation department for job related training and/or special placement. (R. 30-31).

*Evidence Submitted to Appeals Council after the ALJ Decision*

On April 11, 2018 the claimant, complaining of constant palpitations that started two days prior, went to the emergency room at Regional Medical Center and saw Dr. Carter Starr. At

this visit, she was diagnosed with palpitations with multiple PVCs, which are extra heartbeats starting in the claimant's lower ventricles and disrupting her heart rhythm. Dr. Kamran gave the claimant a Holter monitor, although Dr. Kamran stated that he was not concerned with the PVCs. She was stable and discharged the same day. (R. 55).

On October 9, 2018, the claimant went to the emergency room at Regional Medical Center because of chest pain and shortness of breath. The claimant had an ejection fraction of twenty percent and her left ventricle was dilated. She had a defibrillator implanted the following morning to monitor her heartrate. She had no swelling in her extremities, reported no dizziness, ambulated and did "well" post-operation, and was in stable condition with a good prognosis. (R. 69-70, 75).

On March 4, 2019, Dr. Kamran indicated on a form that the claimant had heart failure caused by poor contraction of her left ventricle with an ejection fraction of thirty percent or less during a period of stability, as described in Listing 4.02 *Chronic Heart Failure*. (R. 14).

Also on March 4, 2019, seven months after the ALJ decision, Dr. Kamran completed a physical capacities evaluation form. On the form, Dr. Kamran indicated that the claimant has the following limitations: can sit upright in a chair for one hour at a time; can stand for less than fifteen minutes at a time; would be expected to be lying down, sleeping, or sitting with her legs propped up at waist level or above for six or seven hours in an eight hour period; would be off task eighty-five percent of an eight-hour work day; and would miss multiple days of work in a thirty-day period because of her physical symptoms. Further, Dr. Kamran wrote that he felt "Ms. Brimer is medically disabled and should not be expected to perform any work duties." (R. 15).

Dr. Kamran stated that the limitations he outlined did exist on September 30, 2014, the claimant's alleged onset date. He also noted that he expected the claimant's condition to last

28

twelve months or more, and said her condition was caused by dilated cardiomyopathy with an ejection fraction of twenty percent because of the claimant's past chemotherapy treatment for lymphoma. (R. 15).

## VI.   DISCUSSION

The claimant argues that the ALJ did not adequately consider the claimant's testimony about side effects caused by her medications. This court agrees.

The ALJ must consider the "side effects of any medication the claimant takes or has taken" to treat her symptoms. 20 C.F.R. § 404. 1529(c)(3)(iv). Side effects of medication can render a claimant disabled or contribute to a disability. *See Cowart v. Schweiker*, 662 F.2d 731, 737 (11th Cir. 1981).

*Frequent Urination*

In this case, the ALJ did not adequately consider the claimant's testimony regarding frequent urination. In fact, the ALJ did not even mention the claimant's testimony regarding frequent urination at all in her opinion.

At the first hearing on September 12, 2017, the claimant stated that she needed to use the bathroom "about every five minutes" as a side effect of taking Lasix. (R. 101). At the supplemental hearing on April 18, 2018, the claimant testified that she used the bathroom five to ten times between when she woke up and five o'clock in the afternoon as a side effect of taking Aldactone. (R. 43-45). The record reflects that the claimant's physicians alternated between prescribing Lasix and Aldactone. (R. 461, 451, 615, 1057). And both medications are diuretics, or "water pills," used to treat fluid retention, and have the known side effect of frequent urination.[4]

---

[4] "Not surprisingly, one of the most common side effects of taking water pills is frequent urination." *See* https://www.health.harvard.edu/heart-health/tips-for-taking-diuretic-medications.

Although the claimant did not complain of frequent urination at her medical visits on record, logically, the claimant might not tell her prescribing physician that a diuretic has the side effect of frequent urination. Further, nothing in the record indicates that the claimant would not have this symptom.

Bathroom breaks every five minutes are not "normal breaks" such as the ALJ accounted for in her hypotheticals presented to the vocational expert. In fact, when the ALJ asked the vocational expert at the hearing if the claimant could take breaks every five minutes with complete abandonment of work, the vocational expert said no jobs would be available. Also, the claimant's need to use the restroom five to ten times between waking up and five o'clock in the afternoon are not accounted for by "normal breaks."

Despite the claimant's testimony regarding the limitations caused by the side effects of the Lasix and Aldactone, the ALJ did not mention or address this side effect. So, this court does not know whether the ALJ considered the claimant's testimony and the limitations on her ability to work caused by those side effects.

Because the ALJ did not mention frequent urination at all in her opinion, frequent urination is a logical side effect of talking a diuretic, and the claimant consistently testified concerning her limitations caused by frequent urination, this court finds that the ALJ did not adequately consider the limitations on the claimant's ability to work caused by her side effect of frequent urination.

*Fatigue*

The ALJ also did not adequately consider the side effect of fatigue caused by the claimant's medication.  The claimant complained of fatigue at a follow-up appointment with Dr. Kamran on April 15, 2015, and Dr. Kamran said her fatigue was unchanged at two more

appointments in 2015. (R. 424, 412, 407). He then described the claimant's fatigue as "improved" in September and October of 2017 and "unchanged" at two appointments in January of 2018. (R. 28, 1063, 1067, 1073, 1081).

The claimant testified at the first hearing on September 12, 2017 that her medications, specifically Coreg, Lasix, Aldactone, and Lexapro, make her tired. (R. 101-02). Ms. Edney, a family friend and neighbor, corroborated the claimant's testimony concerning her fatigue. (R. 110). Finally, the claimant also testified at the supplemental hearing on April 18, 2018 that Amiodarone made her tired. (R. 43-44). She stated that, since her alleged onset date, she had about five days a month when she was so tired that it was difficult to get out of bed and she "just felt drained." (R. 51).

All of the claimant's medications have fatigue, drowsiness, or tiredness as a possible or common side effect.[5] And nothing in the record suggests that the claimant would not suffer from fatigue given her many medications with fatigue, drowsiness, or tiredness as a side effect.

Regarding the claimant's fatigue, the ALJ cursorily noted that the claimant complained of fatigue and that Dr. Kamran later described her fatigue as "improved." But the ALJ's simply noting two appointments at which the claimant's fatigue had improved do not negate the other evidence in the record that the claimant's fatigue limited her ability to work. (R. 27). Two isolated incidences of improvement, close in time, with no indication of how great or slight the

---

[5] *See* https://www.healthline.com/health/amiodarone-oral-tablet#side-effects ( fatigue is a common side effect of Amiodarone); https://www.rxlist.com/coreg-side-effects-drug-center.htm (drowsiness and tiredness are common side effects of Coreg); https://www.webmd.com/drugs/2/drug-3776-8043/lasix-oral/furosemide-oral/details/list-sideeffects (drowsiness is a less severe side effect of Lasix); https://www.mayoclinic.org/drugs-supplements/spironolactone-oral-route/side-effects/drg-20071534?p=1 (drowsiness can be a side effect of Aldactone); https://www.mayoclinic.org/diseases-conditions/depression/in-depth/antidepressants/art-20049305 (Fatigue and drowsiness are common in antidepressants like Lexapro).

improvement was, do not contradict the claimant's testimony at both hearings that she had fatigue, a common side effect of her medications, that limited her ability to work.

The fluctuation of the claimant's fatigue also does not disprove the existence and limitation of that side effect. The ALJ stated that treatment notes in the record indicated "good symptom management and control with medication," but he fails to adequately address the side effect of fatigue because of those medications.  The claimant's testimony at both hearings, Ms. Edney's testimony, the claimant's complaints of fatigue at visits with Dr. Kamran, and the fact that fatigue, tiredness, and drowsiness are possible or commons side effects of all of the claimant's medications warrant more from the ALJ than a mere mention of an isolated incident of improvement in fatigue.  This court finds that the ALJ did not adequately consider the claimant's complaints of fatigue as a side effect of her pain medication.

Thus, this court finds that the ALJ did not adequately consider the claimant's testimony concerning her frequent urination and fatigue as side effects of her medications.

## CONCLUSION

For the reasons stated above, this court concludes that the decision of the Commissioner is to be REVERSED AND REMANDED for further action consistent with this memorandum opinion.

The court will enter a separate Order in accordance with the Memorandum Opinion.

DONE and ORDERED this 28th day of August, 2020.

_Karon O. Bowdre_
**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE